UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                                                      **DEFENDANT KELLY McDERMOTT'S SENTENCING MEMORANDUM**

      -against-

                                                      23-CR-158

KATHLEEN BREAULT and
KELLY MCDERMOTT,

                Defendants.
_____

      Kelly McDermott comes before this Court for sentencing on December 10, 2024, having voluntarily surrendered on April 17, 2023, and thereafter entered a guilty plea to the sole charge in the Indictment on July 25, 2024. She has been on pre-trial release since her arraignment and has fully complied with all the conditions set by and all requests of her pre-trial supervisor.

      This case concerns the provision of COVID-19 vaccination cards to persons who did not actually receive the vaccination. Ms. McDermott recognizes and has accepted responsibility for her actions and non-actions regarding the provision of vaccination cards. However, Ms. McDermott did not act out of malice or greed, but rather, her decisions were motivated by the belief that her patients should have the choice and liberty to make informed decisions about their own healthcare. Kelly McDermott is not "anti-vax," rather, she is pro-choice and pro-patient. Nonetheless, she admits and recognizes that in seeking to provide choice for her patients, she violated the law, something she has never even been accused of doing before.

      Kelly McDermott is a licensed midwife who has provided midwifery services to women for nearly 30 years. As the many letters of support attest, she has been a rock of support for

1

countless mothers, babies, and their families. In many ways, she and her business, Sage-Femme Midwifery, represent and provide a traditional version of healthcare – one of house calls and consultations without a stopwatch, one that considers and intentionally makes room for environment, patient comfort, patient goals, and decision-making through information and communication, not doctor fiat. These aspects of her care create patient-practitioner bonds of trust and affection that could not be more prominently stated in the character letters provided to this Court. All of them speak of a mother, partner, friend, and healthcare provider who is generous, hardworking, and constantly helping others in ways large and small.

Kelly McDermott has never been charged with or convicted of any crime. Her midwifery license has never been revoked or suspended. In addition to pleading guilty and accepting responsibility for her actions in word, she has also done so in deed, having already paid the entire restitution amount of $37,414.40, which was to be owed jointly and severally by all three defendants in this case, to the Clerk of the Court.[1]

Consistent with the Probation Department's recommendation, we respectfully submit this Court exercise its discretionary powers and sentence Ms. McDermott to a period of probation. Probation, under these circumstances, is a sentence that is sufficient but not greater than necessary to accomplish the aims of sentencing. *See* 18 U.S.C. § 3553.

## DISCUSSION

**A. Background – Kelly McDermott**

Kelly McDermott is a sixty-two (62) year old mother, wife, and midwife. Having already obtained a bachelor's degree in sociology and women's studies from SUNY Albany in 1985, she went back to school and obtained a bachelor's degree in nursing in 2001 and later obtained a

---

[1] Ms. McDermott's bank records show that the restitution check was negotiated on or about November 7, 2024.

master's of science in midwifery in 2004. For over twenty years, she has provided midwifery services through her business Sage-Femme Midwifery along with other nursing positions she has held at Burdett Health Center/Samaritan Hospital and other such healthcare providers.

Kelly grew up in difficult circumstances in Queens, New York. Her father was largely absent from her life and died at a young age due to alcoholism, and her mother and aunts struggled with serious mental health and addiction issues. Kelly and her siblings were the victims of neglect and physical and emotional abuse on the part of their mother and maternal aunts who helped raise them. Kelly was told she was no good and was otherwise regularly denigrated, so much so that she left her home at seventeen years old and never went back.

Despite her difficult upbringing and their difficult relationship, Kelly cared for her mother at the end of her life during her battle with cancer, taking her to appointments and ensuring that her daily needs were met. Likewise, Kelly refused to continue a cycle of abuse and dysfunction when it came to her own family and children – as set forth below, she has supported her children financially, emotionally, and otherwise with love and dedication through very difficult circumstances.

Kelly has three adult children from a prior marriage, Nina, Mariah, and Galen. Galen is disabled and suffers from autism and significant mental health problems and often resides with Kelly and her husband. Kelly is Galen's appointed payee for SSI benefits and is also his caretaker when he allows her to act in that role. Kelly checks in with Galen on a daily basis to make sure he is doing well and his needs are met.

In addition, Kelly and her husband Gary Edelman have two grown children, Ezra and Rachel. Sadly, a third child, Celeste, died of a heroin overdose in 2016 at age twenty-one. Celeste's death was a significant blow to Kelly, Gary, and their family. Despite Kelly and Gary's

3

repeated and heart-breaking efforts, Celeste's illness could not be overcome. They live every day with the loss of their child and Kelly has sought mental health treatment to cope with PTSD, anxiety, and depression and participates in support groups for adults grieving the loss of their children. Kelly and Gary also support their son Ezra financially and with his mental health issues, which developed after the death of his sister.

As made clear in the support letters, Kelly has not hidden this case or her plea from her family, her patients, or her community. Ever sensitive to their choice, feelings and prerogatives and wanting them to feel free to choose another provider if they so desired, Kelly affirmatively informed her patients about the accusations against her and later her guilty plea. So too her husband is aware of and has acknowledged Kelly's admission of guilt and the reasons for her guilty plea. PSIR at ¶ 72.

Kelly provides numerous midwifery and healthcare services on a *pro bono* and/or reduced rate basis, particularly for those who cannot afford care. She has also created milk banks, launched diaper, food and clothing drives, and provides hospice care for infants and their families. Kelly's practice includes providing services, often at free or reduced rates, to Amish and Mennonite communities in Schoharie County and elsewhere in Upstate New York. These communities often set themselves apart from modern medicine, but nonetheless trust Kelly to provide midwifery and other healthcare services. There is a marked shortage of licensed midwives whose practice includes serving these rural and separated communities who are often uninsured or underinsured. Kelly also provides midwifery services to many in the Orthodox Jewish community, which requires familiarity and comfort with traditions and laws that are both unique and important to those receiving care from that community.

   **B.  Support from Family, Friends, Patients, and Community Members**

Kelly has received overwhelming, incredible support from her family, friends, patients, and community members. At last count, this office has received *over 200 letters of support* for Kelly. But, out of respect for the Court and judicial economy, and also because many of the same themes run through these letters, we have selected and submitted a handful for the Court's review as representatives of the greater whole. One could not begin to contrive such an outpouring of support, gratitude and admiration – as one writer states, Kelly "really is who [the] letters say she is." These letters demonstrate that Kelly McDermott is much more than a person who has committed a crime; she is a person who has touched the lives of many through her generosity, care, and friendship.

Some of the detailed acts of generosity and charity described in the letters include: paying out of pocket for psychological services for her clients; accepting patients on a "pay what you can" basis; continuing to treat patients whose insurance carriers would not provide coverage; mentoring others; opening her home to a young woman in need who lived with her rent-free for three years; initiating drives for clothing, equipment, milk, diapers, baby food and other material goods for mothers in need; providing space at Sage-Femme free of charge to other professionals with small practices; etc.

The support letters also describe the care Kelly provides and her philosophy of informed consent and informed decision-making in patient care. For example, Melissa Martin describes how Kelly counseled her about the risks/benefits of getting a flu vaccine, which Melissa ultimately decided to receive at Sage-Femme. Others provide accounts of hours spent counseling and caring for pregnant women and their families and above all the pivotal and unique role she plays as a healthcare provider in the community.

Kelly cares for those who have been harmed or neglected by prior providers, those who do not, for cultural and/or religious reasons, feel comfortable in a hospital setting, and those who otherwise could not afford the type of personalized care she provides. This is particularly true of those in the Orthodox Jewish, Amish, and Mennonite communities. As one of her patients Marian Fisher states in her letter, Kelly's willingness to perform home births in remote Amish communities hours from the closest birth center has "saved more than one concerned parent a trip to the emergency room." Nurse Keturah Beiler writes that Kelly fills a critical "role in providing culturally sensitive care [that] has been instrumental in bridging the gap between modern healthcare practices and the unique needs of the Amish population." Hospice care for infants with genetic anomalies in Amish communities is an example of one such unique need.

She is also the rock of her own family, supporting her husband and her children financially while also providing various forms of care, love, and generosity to her grown children who have disabilities. As mentioned above, Kelly is involved in managing and supporting the well-being of her son Galen, who suffers from executive function deficits and requires assistance managing the tasks of daily life.

All these letters either directly or implicitly ask the Court for leniency and to consider Kelly's admitted guilt to this single charge within the greater context of who she is, what she has done for others, and the need for her midwifery practice to continue. Kelly assists underserved communities, and incarceration would create a void in those communities. Jordan and Leah Fruchter directly asked themselves whether they were "comfortable with a felon delivering [their] child[?]" They concluded that to define Kelly only through her conviction "would ignore who [she] is as a person and all of the good she has done helping families like [their] own."

Likewise, Washington County Chief Assistant District Attorney Christian Morris's letter describes asking Kelly the "hard questions" about the charge against her from the perspective of a seasoned prosecutor, which were met with open and honest answers, not "excuses or justifications." Formally pleading guilty before the Court demonstrates a personal acceptance of responsibility. Openly articulating and accepting guilt before those who hold her in such high esteem, and whose trust she has worked tirelessly to earn, demonstrates a "strength of character that few have."

C. **Nature of the Offense**

The essence of the Government's charge, and the basis for Kelly McDermott's guilty plea, is that she (along with Kathleen Breault and Sherilyn Pellitteri) facilitated the provision of COVID-19 vaccination cards to persons who did not obtain the vaccination. Kelly McDermott admits these essential allegations but must provide some context to the Court regarding Sage-Femme, her role in the offense, and her underlying motivation.

Sage-Femme Midwifery is not a typical business, much less a typical healthcare business. While it is a for-profit business, it shares many of the hallmarks associated with not-for-profit organizations, including mission-driven (rather than profit-driven) services, community-oriented support and social connections, a focus on charitable causes and needs, and an egalitarian rather than hierarchical corporate structure.

Notably, both Breault and Pellitteri were not employees of Sage-Femme, rather, they were independent contractors who provided services to Sage-Femme and its patients through their own businesses that subcontracted with Sage-Femme. Breault maintained her own business called "Safe Passage Midwifery," while Pellitteri mainlined her own business called "Mother Love Birth Service." Over the years, several other businesses and individuals have either rented space at

7

Sage-Femme or provided services to Sage-Femme patients as independent contractors, such as chiropractic, massage therapy, lactation, nursing, etc. Kelly McDermott was not the "boss" of any of these contractors, who treated their patients independently, and who were provided access to the Sage-Femme office through keypad access, including when Kelly McDermott was at the Sharon Springs office in Schoharie County, New York, every Wednesday and Friday. The same is true of Breault and Pellitteri, who were independent contractors from the beginning. Breault, as an affiliate of Sage-Femme, still had her own clients and Pellitteri, also a nurse, provided services to both Kelly McDermott's clients and clients of Kristin Klein (another formerly-affiliated midwife).

Without denying her guilt or that she was aware that cards were being distributed, the fact is that Kelly McDermott did not play an outsized or leadership role in the conspiracy. She was mostly not present on the "clinic days" at the Sage-Femme office in Albany, which were held on the days Kelly was at the Sharon Springs Sage-Femme office. Moreover, Kelly McDermott did not at the time know how many persons received the cards because she almost entirely out of the office on days when Breault and Pellitteri ran the "clinics," and Kelly has always maintained a full and busy schedule (averaging 7 births per month), including during the COVID-19 pandemic. She is not tech savvy and did not have access to or know how to access NYSIIS. While she became aware that several (approximately 15) of her own patients and a cousin of hers received vaccination cards, she did not know the full scale of others that apparently received cards, nor that proofs of vaccinations had been apparently processed for children by Breault and/or Pellitteri.

Importantly, Kelly McDermott's treatment philosophy regarding vaccines is more nuanced than has been presented. Kelly is not "anti-vaccination," rather, she is pro-choice, pro-information, and pro-patient. Kelly respects a patient's right to choose whether to receive a vaccination, or

choose not to after being informed of the attendant risks and benefits. Indeed, Kelly counseled her own family members who did receive the COVID-19 vaccination and the same is true of patients she counseled who did elect to receive the flu vaccination. Kelly's philosophy is born out in her practice: agency over one's own body. For example, Kelly asks her patients, every time, if she may touch them before she does, because patient choice and agency are central to Kelly's care.

Without renouncing her philosophy of care upon which is the foundation for her treatment of every patient and mother, Kelly has admitted guilt because her actions crossed the line, violating the law.

### D. Pre-Sentence Report and Guideline Calculation

The Presentence Investigation Report ("PSIR") scores Ms. McDermott as follows: Probation assigned a total offense level of 12 and a criminal history Category I, resulting in a guideline range of ten (10) to sixteen (16) months. Ms. McDermott does not object to the base offense level or to the four-point enhancement for loss to the victim under §2B1.1(C), though as set forth above, she has paid restitution in full such that there is presently no "actual loss" to the CDC. However, for the reasons below, we object to the two-point enhancements for abuse of trust and role in the offense and object to an upward variance. Because those enhancements should not apply, Ms. McDermott meets the criteria for a zero-point offender adjustment under §4C1.1, resulting in a total offense level of 8, and a guideline range of 0-6 months in Zone A.

1. *Leadership Enhancement under §3B1.1(c) Should not Apply*

Kelly McDermott was and is the principle officer of Sage-Femme Midwifery, however, that fact does not *ipso facto* make her a manager/supervisor of the instant conspiracy. It is inaccurate that McDermott "set the days and work hours in which Breault and Pellitteri" provided cards. Indeed, Breault and Pellitteri were the distributors of the cards and Breault was not often in the office space during weekdays. Pellitteri filled out the onboarding documents with the CDC

and DOH, naming herself "back-up COVID-19 vaccine coordinator," but in fact was directly and actively providing vaccine cards to others along with Breault. There is no evidence or accusation that Kelly McDermott directed or instructed Breault or Pellitteri on how to distribute cards or how to input data into NYSIS, which was entirely done by Pellitteri and/or Breault. Moreover, Pellitteri worked as a 1099 independent contractor with Sage-Femme, providing services not just to Sage-Femme, but also to other independent contractors who rented or shared space in the Sage-Femme building, including Breault. As mentioned above, Breault and Pellitteri maintained their own businesses. Thus, while it is true that the "clinic days" occurred at the Sage-Femme Albany office, there is no evidence that Kelly McDermott was any more of an "organizer, leader, manager, or supervisor" in the instant offense than Breault and/or Pellitteri.

Again, this is not to suggest that Kelly is not culpable or was not part of this conspiracy. Rather, it is to explain that the conspiracy was a reflection of Sage-Femme's egalitarian rather than hierarchical corporate structure, moving parts and people, disorganization at times, and independent providers/actors.

2. *Abuse of Trust Enhancement under §3B1.3 Should Not Apply*

The proposed application of §3B1.3 is based on the alleged abuse of a position of public trust. As evidenced by the many letters of support, however, there is no evidence or accusation that she breached the trust of any patient or client, nor that she failed to provide any service in breach of a professional duty. Kelly McDermott was a certified nurse midwife at all times relevant to these charges, and remains certified today. However, there is no allegation or evidence that Kelly McDermott used any of her skills as a nurse or midwife in the commission of the offense.

The position of public trust enhancement under §3B1.3 is typically applied in instances where the offense causes harm to the person whose trust has been placed with the defendant, such

as "embezzlement of a client's funds by an attorney serving as a guardian" or "criminal sexual abuse of a patient by a physician." USSG §3B1.3, Commentary at ¶1. "An abuse of trust enhancement may not be imposed on a defendant convicted of fraud solely because of a violation of a legal obligation to be truthful and victim's reliance on a misrepresentation." *U.S. v. Hirsch*, 239 F.3d 221, 227 (2d Cir. 2001). A defendant "who merely engages in arms-length dealings in a commercial transaction does not hereby occupy a position of trust." *U.S. v. Wright*, 160 F.3d 905, 910 (2d Cir. 1998). "Nor does a corporate officer who negotiates a procurement contract with the government thereby occupy a position of trust vis-à-vis the government." *Id.* (citation *U.S. v. Broderson*, 67 F.3d 452, 455 (2d Cir. 1995)). The extent to which Kelly McDermott was directly involved in the procurement and distribution of the COVID vaccines at issue here was extremely limited and, for the same reasons discussed in *Wright* and *Broderson*, does not justify the application of §3B1.3.

### E. No Upward Departures are Warranted

We similarly submit that an upward departure is inappropriate in this case. Applicability of an upward departure must be established by a preponderance of the evidence. *U.S. v. Cordoba-Murgas*, 233 F.3d 704 (2d Cir. 2000). There is no evidence, let alone a preponderance of the evidence, that Kelly McDermott caused a significant disruption of a government function by extending "the time needed by HHS and CDC to reach herd immunity against COVID-19, allowed for unnecessary spread of the COVID-19 virus" and prolonged the pandemic. As of February 4, 2021, over 35,203,000 doses of the Covid-19 vaccine had been administered. To suggest that the vaccination cards for which Kelly McDermott is responsible had a significant enough impact to delay herd immunity (however that term is defined) and thereby prolonged the pandemic, is highly speculative and without factual support.

Moreover, application of §5K2.7 applies "[i]f the defendant's conduct resulted in a significant disruption of a governmental function." However, "departure from the guidelines ordinarily would not be justified when the offense of conviction is an offense such as bribery or obstruction of justice; in such cases interference with a governmental function is inherent in the offense." Similarly, here, interference with governmental function is inherent in the offense of conspiracy to defraud the United States – our federal government. Moreover, such alleged disruption is speculative as set forth above.

**F.    A Sentence of Probation is Warranted**

In considering the restitution paid, Kelly's overall life, her lack of criminal history, as well as her success on unsupervised release since the onset of this case, it is respectfully submitted that a period of probation and restitution is the proper punishment, and that any term of imprisonment would be greater than necessary under the factors outlined in 18 U.S.C. § 3553(a).

1.    *Seriousness of the Offense & Just Punishment 18 USC § 3553(a)(2)(A)*

Kelly McDermott has completely accepted responsibility for the crime she committed and paid restitution in full on behalf of herself and to the benefit of her co-defendants. However, Kelly McDermott did not harm or intend to harm anyone, nor did she intend to prevent anyone who wanted a vaccine from obtaining one. Indeed, there is no accusation and the Government has provided no evidence that her actions prevented anyone from getting the COVID-19 vaccine. Notwithstanding the Government's suggestions to the contrary, we have been provided no evidence that any individual was, at any time, harmed.

Rather, this case concerns the frustration of a government-funded program. Kelly McDermott has accepted the loss amount asserted by the Government based solely on the representations of AUSA Campbell and has already paid restitution in full to CDC. No other victim

has been identified and if any had been, Ms. McDermott would have taken steps to make them whole.

2. *Deterrence – 18 USC §3553(a)(2)(B)*

Kelly McDermott is a 62-year old midwife with no criminal history whatsoever. She is committed to her practice and the patients she serves. She has no history of drug or alcohol abuse. She has no history of violence or malevolence of any nature. For those in Category I over the age of fifty, the recidivism rate is a mere 6.2%. U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 15 (2004), Ex. 9 at 28. *Available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf. For those in Category I who are married, the recidivism rate is 9.8%, and the rate is 7.1% for college graduates. *Id*., Exhibit 10 at 29.

In imposing a sentence, the Court should consider the statistically low risk of recidivism presented by Kelly's history and characteristics. *United States v. Hamilton*, 323 Fed. Appx. 27, 31 (2d Cir. 2009) ("the district court abused its discretion in not taking into account policy considerations with regard to age recidivism not included in the Guidelines"), *Simon v. United States*, 361 F. Supp. 2d 35, 48 (E.D.N.Y. 2005) (basing variance in part on defendant's age of 50 upon release because recidivism drops substantially with age). Simply put, Kelly does not pose a threat to commit future crimes.

In paying restitution in full, Kelly has proven that she is already deterred from committing any future crime and has taken every step possible to take responsibility for and make amends for her serious actions that caused this prosecution. To the extent that there is further need for deterrence, it can be accomplished through probation.

Finally, it must be considered that this case has been pending for over a year-and-a-half, during which time Kelly McDermott successfully maintained her status with pre-trial services and continued her practice. Thus, she has proved that she is law-abiding and will perform well on probation if that is the Court's determination.

3. *Incapacitation – 18 USC §3553(a)(2)(C)*

Incapacitation deals primarily with removing a dangerous person to protect society. As set forth in numerous character letters submitted on her behalf, Kelly is not a dangerous person, she is a helper and a healer. She is someone who contributes to society and provides healthcare services to communities and women at the margins. Thus, there is no reason to incapacitate her from doing her important work. Indeed, as set forth in the numerous character letters, removing Kelly from the community would harm those who depend on her care and expertise.

4. *Need to Avoid Unwarranted Disparities or Similarities – 18 USC §3553(a)(6)*

Historically within the Second Circuit, defendants convicted of crimes involving fraud, theft, or embezzlement represent a larger percentage of the individuals sentenced to non-incarceration sentences relative to the percentage of total cases they represent. For example, in 2023, individuals convicted of fraud, theft, or embezzlement made up only 17.6% of defendants in the Second Circuit, but accounted for 41% of all individuals sentenced to non-incarceration sentences. *See U.S. Sent'g Comm'n, Satistical Info. Packet*, Fiscal Year 2023, Second Circuit, Table 5 (2023).[2]

---

[2] The Sentencing Commission's data is available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2023/2c23.pdf. Similar trends emerge for both 2022 and 2021. *See* U.S. Sent'g Comm'n, Statistical Info. Packet, Fiscal Year 2021, Second Circuit, Table 5 (2021), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2021/2c21.pdf; U.S. Sent'g Comm'n, Statistical Info. Packet, Fiscal Year 2022, Second Circuit, Table 5 (2022) available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2022/2c22.pdf.

These same data show similar trends in the use of downward departures or variances. Nationally, defendants convicted of crimes involving fraud, theft, or embezzlement in 2021, 2022, and 2023 saw downward departures or variances in 43.4%, 43.8%, and 45.5% respectively. *See U.S. Sent'g Comm'n, Statistical Info. Packet, Fiscal Year 2021,* Second Circuit, Table 10 (2021); *See U.S. Sent'g Comm'n, Statistical Info. Packet, Fiscal Year 2022,* Second Circuit, Table 10 (2022); *See U.S. Sent'g Comm'n, Statistical Info. Packet, Fiscal Year 2023,* Second Circuit, Table 10 (2023).

What these numbers tell us is that in like cases, courts in this Circuit and nationally have continued to favor downward departures and variances and use of non-incarceration alternatives. While every case is unique, this case warrants similar considerations and as probation has recommended, a statistically consistent outcome.

## **ADDITIONAL REQUESTS**

If the Court determines that Kelly's conduct warrants some incarceration, which for the reasons set forth herein we believe is not necessary, it is respectfully requested that the Court make the following recommendations to the Bureau of Prisons. That she:

(a)  be allowed to self-surrender and report;
(b)  be assigned to a minimum-security facility; and
(c)  be assigned to such a facility as close to Albany, New York as possible so she can remain near her family.

Regarding facility determinations, we recognize that the Bureau of Prisons makes the ultimate determination. However, the Bureau of Prisons does try to accommodate and/or honor a judge's recommendation.

## CONCLUSION

For the reasons set forth herein, we request that Kelly McDermott be sentenced to a modest period of probation, restitution in the amount of $37,414.40, and the mandatory special assessment. Such a sentence is sufficient, but not greater than necessary, to comply with the statutory directives set forth in 18 U.S.C. §3553(a). Kelly has accepted responsibility for her actions and is committed to continuing her work as a midwife and care provider in a lawful manner.

Dated: November 26, 2024  **CAPEZZA HILL, LLP**

_____/s_____
BENJAMIN W. HILL, ESQ.
*Attorney for Defendant Kelly McDermott*
30 South Pearl St., P-110
Albany, NY 12207