

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

JPL/TJT:PJC
F. #2022R00246

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

December 2, 2024

By ECF

The Honorable Rachel P. Kovner
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Kelly McDermott
Criminal Docket No. 23-158 (RPK)

Dear Judge Kovner:

The defendant Kelly McDermott's medical practice, Sage-Femme Midwifery PLLC ("Sage-Femme"), distributed more than 2,600 fraudulent COVID-19 vaccination record cards, destroyed the corresponding number of COVID-19 vaccine doses, and made the same number of false entries in a New York State vaccination database. McDermott and her co-conspirators wasted taxpayer money, diverted scarce vaccines from those who wanted them, usurped the role of the federal government, and prolonged the deadly COVID-19 pandemic. This conduct warrants serious punishment.

The government respectfully submits this letter in anticipation of sentencing in the above-referenced case, which is currently scheduled for December 10, 2024, and in response to the defendant's submission (the "Defendant's Submission"). (ECF No. 56.) On July 25, 2024, McDermott pleaded guilty before the Honorably Taryn A. Merkl, United States Magistrate Judge, to conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, in connection with her role in a scheme to distribute false COVID-19 vaccine cards and deprive the United States government of its lawful government function in managing public health. (ECF No. 1 (the "Indictment").)[1] In light of the seriousness of the offense and the harm caused to the government and public health, and in order to provide specific and general deterrence and promote respect for the law, the government respectfully submits that a sentence of 36 months' imprisonment, which is above the United States Sentencing

[1] The Court has not yet accepted McDermott's plea.

Guidelines ("U.S.S.G." or "Guidelines") range of 10 to 16 months' imprisonment, is sufficient, but not greater than necessary, to achieve the goals of sentencing. See 18 U.S.C. § 3553(a). The government also respectfully requests that the Court order the defendant to pay restitution in the amount of $37,414.40.[2]

## I. Background and Criminal Conduct

As charged in the Indictment and described in the Presentence Investigation Report ("PSR"), between approximately June 2021 and March 2022, McDermott agreed with co-conspirators Kathleen Breault and Sherilynn Pellitteri to distribute more than 2,600 false COVID-19 vaccination record cards, destroy the same number of COVID-19 vaccine doses, and falsely enter the same number of individuals' information into a New York State database tracking COVID-19 vaccinations. (PSR ¶ 21.)

Breault and McDermott are midwives licensed by New York State, and Breault worked for McDermott at her company, Sage-Femme, which is principally located in Albany, New York. (Id. ¶¶ 4-6.) Pellitteri is a licensed practical nurse ("LPN") who worked for McDermott. (Id. ¶ 7.)

COVID-19, which emerged in the United States in early 2020, is a deadly and highly contagious respiratory pathogen that has killed more than one million Americans. (Id. ¶10.) Once the government approved vaccines to combat COVID-19, providers like Sage-Femme enrolled with the United States Centers for Disease Control and Prevention ("CDC") and New York State to distribute the vaccine. (Id. ¶ 17.) New York State maintained a database to track the distribution of vaccines, including the COVID-19 vaccine. (Id. ¶ 14.) Rather than distribute COVID-19 vaccines, McDermott and her co-defendants provided individuals who wanted proof of vaccination without being vaccinated with legitimate cards completed with false information. (Id. ¶ 21.) The defendants destroyed vaccine doses and made false entries into the New York State database. (Id.) Legitimate cards and database entries were valuable because they could be cross-checked. At one point, Sage-Femme outpaced large, State-run vaccination sites in terms of the number of Johnson & Johnson vaccines it purportedly distributed. (Id. 24.) In at least some instances, the defendants accepted cash donations to Sage-Femme at the rate of $100 each for the fraudulent card and database entry.[3] (Id. ¶ 22.) The New York State Department of Health ("DOH") shuttered Sage-Femme's COVID-19 vaccination program after complaints about improper vaccine administration to minors and upon discovering that Sage-Femme was improperly storing vaccine doses.

[2] While McDermott may have prepaid this sum with the Clerk's Office, the Court must still order restitution.

[3] The extent of donations is not known because they were made in cash, but if even half of those who received fake vaccine cards donated, the scheme would have netted $130,000. Breault and Pellitteri indicated that all donations were turned over to McDermott.

The scheme was far reaching. Although it was a small practice in Albany, Sage-Femme purported to vaccinate more than 300 individuals from Brooklyn and Staten Island, individuals from as far away as California, minors who were not at the time approved to be vaccinated against COVID-19, and Canadian citizens who never entered the United States. (Id. ¶ 25.) The practice became so busy "vaccinating" against COVID-19 that it began to disrupt its pregnant mother population who was obtaining legitimate medical services. (Id. ¶ 24.)

The scheme also did more than just permit those who wished to remain unvaccinated against COVID-19 avoid vaccination. The destruction of scarce vaccine doses cost the United States approximately $37,414.40. (Id. ¶ 21.) It also contributed to vaccine scarcity, prolonged the pandemic, and furthered the unnecessary spread of the COVID-19 virus. (Id.)

## II. The Guidelines Calculation

In the PSR, the United States Probation Department ("Probation") correctly calculates the Guidelines as follows:

| | |
|---|---|
| Base offense level (U.S.S.G. §§ 2X1.1(a), 2B1.1(a)(2)) | 6 |
| Plus: Loss exceeding $15,000 (U.S.S.G. § 2B1.1(b)(1)(C)) | +4 |
| Plus: Abuse of trust (U.S.S.G. § 3B1.3) | +2 |
| Plus: Aggravating role (U.S.S.G. § 3B1.1(c)) | +2 |
| Less: Acceptance of responsibility (U.S.S.G. § 3E1.1(a),(b)) | -2 |
| Total: | 12 |

(Id. ¶¶ 47-56.)

With a criminal history category of I and a total offense level of 12, McDermott's advisory Guidelines range of imprisonment is 10 to 16 months. (Id. ¶ 106.) McDermott does not have a plea agreement with the government.

### A. McDermott Managed or Supervised the Conduct

McDermott argues that she did not manage or supervise anyone in the scheme, and as such, that she is not subject to a two-point role enhancement, which also has the effect of disqualifying her for a two-point Chapter Four reduction as a zero-point offender. (Defense Submission at 9-10.) There is more than sufficient evidence for the Court to conclude that a role enhancement applies.

Guidelines Section 3B1.1(c) states that, "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in subsection (a)

or (b)," a two-level increase applies. McDermott was an organizer, leader, manager, and supervisor, although the Court need only find she was one of these things. U.S.S.G. § 3B1.1(c).

First, McDermott's managerial and supervisory position is clear on paper. She owned Sage-Femme and hired others, including Pellitteri and Breault, to work for her. (See Defense Submission at 7-8.) McDermott was also a leader and organizer in that she was listed as the primary vaccine coordinator on paperwork with the DOH. (Id. at 9-10.) While McDermott downplays this by suggesting that Pellitteri had an outsized role in the scheme compared to McDermott, this ignores that Pellitteri is an LPN who could not enroll as a vaccine provider and could not operate independently as a medical provider.

Second, McDermott had Breault and Pellitteri handle the fraudulent vaccine card distribution. In an undated text message between McDermott and Breault, McDermott asked Breault, "Can you schedule to administer to your people and document." (See Exhibit A, attached hereto.) Text messages between Pellitteri and McDermott show that McDermott sent individuals to Pellitteri to obtain fake vaccine cards, largely keeping herself out of it to create and maintain plausible deniability. For example, on June 27, 2021, McDermott texted Pellitteri, "Are the vaccine doses spoken for?" When Pellitteri said no, McDermott told her, "[A.D.] will come in on Monday." (See Exhibit B, attached hereto.) Similarly, in or about February 2022, McDermott texted Pellitteri a copy of a message from patient C.M. that indicated she came in for a COVID-19 vaccine in September and now needed a booster and was "hoping [she] would be able to do that through your office." (See Exhibit C, attached hereto.) Pellitteri took direction from McDermott regarding to whom she should provide fake vaccine cards.

Third, McDermott participated in the planning and organizing of the scheme, which also demonstrates she had a leadership role.[4] During undated text messages with patient T.N. about whether Sage-Femme could acquire vaccine doses, McDermott explained that "[w]e're checking everyday [sic]," elaborating, "[m]y concern is what if I can get moderna or Pfizer but not j and j." (See Exhibit D, attached hereto.) McDermott suggested to her patients that she was taking the lead in transforming Sage-Femme into a fraudulent vaccine provider because she was, in fact, in charge of that effort.

Fourth, Pellitteri was a lower licensed medical provider who was supervised by and reported to McDermott. McDermott enlisted Pellitteri to help her with the logistics of fraudulently obtaining vaccine doses. For example, on August 19, 2021, McDermott texted Pellitteri, "What's [sic] our prospects on moderna?" Pellitteri replied, "I think we can get it.. [sic] there was a manufactures [sic] shortage but that seems to be resolved." McDermott told her, "Can you work on that today?" (See Exhibit E, attached hereto.) More importantly,

---

[4] The commentary to Guidelines Section 3B1.2 specifically notes that "participation in the planning or organizing of the offense" is relevant in distinguishing among leaders and managers. See Guidelines § 3B1.2, Application Note 4.

Pellitteri worked under the direction of a midwife; thus, seeing patients on her own would have been outside the scope of her practice as an LPN.[5]

Fifth, while McDermott maintains that she never told her co-conspirators "how to distribute cards," Defense Submission at 10, text messages show otherwise and further demonstrate her managerial role in the scheme. On September 28, 2021, McDermott texted Breault, "Hey Kath…can we talk about the flow of clients on Mondays? Anyway [sic] to schedule in groups of 2 so as to not overwhelm the office staff and ambience that is [Sage-Femme]? Also prefer rear entry when ladies are here." (See Exhibit F, attached hereto.) This is corroborated by Breault's statements to law enforcement that, at some point, the vaccine card scheme grew to a point such that it became disruptive to the business of Sage-Femme, prompting McDermott to ask Breault to change when she saw people and how she allowed "patients" to enter Sage-Femme. This evidence also belies McDermott's suggestion that she "did not know the full scale of others that apparently received cards." (Defense Submission at 8.)

Finally, Pellitteri and Breault both indicated to law enforcement that McDermott had the final say on all things Sage-Femme. Breault told law enforcement that "McDermott made all the decisions at Sage-Femme." Pellitteri similarly told law enforcement that McDermott told her "which days she can give the vaccines."

McDermott led Sage-Femme as its owner, she organized the fraudulent COVID-19 vaccination program by planning Sage-Femme's enrollment with the CDC and DOH and becoming the primary vaccine coordinator, she managed Breault and Pellitteri's schedule and the office space used for distributing fake vaccine cards, and she supervised Pellitteri, an LPN, who could not see patients herself or enroll with the CDC and DOH as a vaccine provider. McDermott's conduct qualifies for a role enhancement.

B. The Abuse of Trust Enhancement Applies

McDermott also argues that a two-point enhancement for abuse of a position of trust under Guidelines Section 3B1.3 does not apply. (Id. at 10-11.) Because McDermott used her position as a midwife to gain access to COVID-19 vaccines and fraudulently provide proof of vaccination, this enhancement applies.

Guideline Section 3B1.3 applies a two-point enhancement "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." The commentary to the Guidelines define "special skill" to include those skills held by "doctors" and they define

[5] "New York's Nurse Practice Act allows LPNs to provide nursing services under the direction of a registered professional nurse (RN), clinical nurse specialist, physician, nurse practitioner, licensed midwife, physician assistant, specialist assistant, dentist, or podiatrist ('directing practitioner')." https://www.op.nysed.gov/professions/licensed-practical-nurses/practice-information-for-licensed-practical-nurses.

"public or private trust" to including "position[s] . . . characterized by professional or managerial discretion." U.S.S.G. § 3B1.3, Application Notes 1, 4.

Case law makes clear that medical providers engaged in fraud have abused a position of trust. For example, in United States v. Ntshona, 156 F.3d 318, 321 (2d Cir. 1998), the Second Circuit joined other circuits in holding that "a doctor convicted of using her position to commit Medicare fraud is involved in a fiduciary relationship with her patients and the government and hence is subject to an enhancement under § 3B1.3." See also United States v. Iovine, Nos. 97-1543(L), 97-1670 (CON), 97-1560 (CON), 1998 WL 907427, at *2 (2d Cir. Dec. 23, 1998) (same, applied to a licensed nurse).

There can be no real dispute that, as a midwife, McDermott possesses special skills and a position of trust—the letters attached to her sentencing submission demonstrate that people trust her with their lives and to deliver their children. McDermott falsely suggests that because she was not "directly involved in the procurement and distribution of the COVID vaccines" she has not abused a position of trust. (Defense Submission at 11.) But this ignores that her credentials as a midwife were central to the scheme. If she was not a medical provider, she could not have enrolled with the CDC and DOH to provide vaccines and enter information into the New York State database. Because she used her position as a licensed medical provider to gain access to COVID-19 vaccines to facilitate the fraudulent vaccine card distribution scheme in violation of the trust placed in her by the CDC and DOH, a two-level enhancement applies.

C. The Guidelines Permit a Sentence Above the Applicable Guidelines Range

The Sentencing Guidelines permit the Court to impose a sentence above whatever range it determines applies in this case. Specifically, Section 5K2.7 states that, "[i]f the defendant's conduct resulted in a significant disruption of a governmental function, the court may increase the sentence above the authorized guideline range to reflect the nature and extent of the disruption and the importance of the governmental function affected." Section 5K2.14 states that, "[i]f . . . public health . . . was significantly endangered, the court may depart upward to reflect the nature and circumstances of the offense." Contrary to McDermott's arguments, both provisions plainly apply here.

First, McDermott's conduct significantly disrupted an important governmental function—safeguarding public health. McDermott took public health policy into her own hands, usurping the role of the CDC and fraudulently enabling approximately 2,600 people to side-step public health measures at the expense of others' health. At one point, Sage-Femme was purporting to administer more Johnson & Johnson vaccines than large, state-run vaccination sites. Her scheme had tremendous reach, involving people from California to Canada. Although she suggests that Section 5K2.7 does not apply because interference with a government function is inherent in her offense (Defense Submission at 12), Section 5K2.7 recognizes that the Guidelines may not reflect the appropriate punishment if the "circumstances are unusual." As explained below, this is an unusual case where the Guidelines—driven by the modest loss to the government—do not provide appropriate

punishment for the conduct. The consequences of McDermott's conduct, which disrupted the government's ability to protect the public from and mitigate the effects of a once-in-a-lifetime global pandemic, are not inherently able to be quantified, and that is why Section 5K2.7 permits the Court to depart upwardly.

Second, McDermott's conduct significantly endangered public health. She diverted more than 2,600 vaccines that, but for her actions, would have been administered to those desperately seeking vaccination. She permitted more than 2,600 individuals to pass themselves off as vaccinated, and each of those 2,600 individuals then encountered countless other individuals, potentially further spreading disease exponentially.[6] At least one study has shown that vaccine hesitancy—that is, people delaying or not becoming vaccinated—prolonged the COVID-19 pandemic and increased mortality rates approximately seven-fold.[7] And while McDermott suggests that her fraud scheme was too small to have had broader impacts on society (Defense Submission at 11), she ignores that, because she mostly operated in some of the least populated areas of New York State, including Schoharie County, which has a population of only 30,000 people,[8] her conduct likely had outsized local effects given the smaller population in those areas. In sum, she prevented the federal government from carrying out its public health function and put public health in danger by perpetuating the COVID-19 pandemic, which is precisely what Section 5K2.14 aims to address in permitting the Court to depart upwardly.

## III. A 36-Month Sentence Is Appropriate

### A. Legal Standard

In United States v. Booker, the Supreme Court held that the Guidelines are advisory and not mandatory, and the Court made clear that district courts are still "require[d] . . . to consider Guidelines ranges" in determining sentences, but also may tailor the sentence in light of other statutory concerns. 543 U.S. 220, 245 (2005); see 18 U.S.C.

---

[6] This is particularly true for the approximately 300 residents of this District who had fake vaccination cards, considering the population density of New York City and the number of individuals with which they would interact during a single day.

[7] Daniela Olivera Mesa, et al., Modelling the impact of vaccine hesitancy in prolonging the need for Non-Pharmaceutical Interventions to Control the COVID-19 pandemic, 2 Communications Medicine 14 (2022), attached hereto as Exhibit G. A study of mortality from COVID-19 among vaccinated and unvaccinated populations involving more than 22 million patients concluded that unvaccinated patients were 2.46 times more likely to die compared to vaccinated patients. See Anderson E. Ikeokwu, et al., Unveiling the Impact of COVID-19 Vaccines: A Meta-Analysis of Survival Rates Among Patients in the United States Based on Vaccination Status, 15 Cureus 8 (2023), attached hereto as Exhibit H.

[8] https://www.census.gov/quickfacts/fact/table/schohariecountynewyork/PST045223.

§ 3553(a). Subsequent to Booker, the Second Circuit has held that "sentencing judges remain under a duty with respect to the Guidelines . . . to 'consider' them, along with the other factors listed in section 3553(a)." United States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005). Although the Second Circuit declined to determine what weight a sentencing judge should normally give to the Guidelines in fashioning a reasonable sentence, it cautioned that judges should not "return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum." Id. at 113.

Subsequently, in Gall v. United States, 552 U.S. 38 (2007), the Supreme Court elucidated the proper procedure and order of consideration for sentencing courts to follow: "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall, 552 U.S. at 49 (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the Court] may not presume that the Guidelines range is reasonable. [The Court] must make an individualized assessment based on the facts presented." Id. at 50 (citation and footnote omitted).

Title 18, United States Code, Section 3553(a) provides numerous factors that the Court must consider in sentencing the defendant. These factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to (a) reflect the seriousness of the offense, to promote respect for the law and to provide just punishment, (b) afford adequate deterrence to criminal conduct, (c) protect the public from further crimes of the defendant, and (d) provide the defendant with appropriate education or vocational training; (3) the kinds of sentences available; (4) the Guidelines range; (5) pertinent policy statements of the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution.

## B. Application of Law

The government respectfully requests that the Court impose a sentence of 36 months' imprisonment, which is above the Guidelines range of 10 to 16 months' imprisonment, because such a sentence is sufficient, but not greater than necessary, to achieve the goals of sentencing. See 18 U.S.C. § 3553(a). Specifically, the circumstances of this case, the history and characteristics of the defendant, the need to promote respect for the law and provide just punishment, the need for specific and general deterrence, and the need to avoid unwarranted sentencing disparities warrant such a sentence.

### 1. The History and Characteristics of the Defendant Warrant a Significant Sentence

While McDermott has apparently led an otherwise law-abiding life and provided medical care to many individuals, the instant crime shows she is willing to commit

fraud to advance her own interests. She abused her position of trust as a midwife to enroll with the CDC and New York State under the false pretenses that she would vaccinate people against COVID-19. Her enrollment was a lie. She knew that her patients' "choice" was to perpetrate a fraud against the health care system and the health care authorities, and she took on that cause. She could have stayed on the sidelines and debated the issues of vaccine safety, but she chose to break the law.

McDermott crossed the line from advocating for patient choice and educating her patients on vaccine risks into breaking the law—2,600 times over. However well-intentioned she feels her conduct was, she had a choice. She could have upheld her duty as a medical provider and advised her patients about the potential risks of the COVID-19 vaccines. Instead, she took the law into her own hands, and by doing so, demonstrated a blatant lack of respect for the law. She also took away the choice of those whom she did not treat who encountered her patients. Countless individuals unwittingly came into contact with unvaccinated individuals who were lying about their vaccine status because McDermott enabled them to do so. By empowering her patients' "choice," McDermott deprived members of the public of their freedom to not be exposed to individuals who were unvaccinated.

Notably, the instant charges are not the only time McDermott has put her own views above those of public health officials. Prior to distributing fake COVID-19 vaccination cards, McDermott and Sage-Femme provided fake proof of influenza vaccination to Sage-Femme patients in the name of patient "choice" to ignore the rules.[9] For McDermott, compliance with the law is optional so long as she feels justified by her beliefs.

McDermott was also calculated in carrying out this scheme. Although she had no choice but to list herself as the primary COVID-19 vaccine coordinator in light of Pellitteri being an LPN, McDermott otherwise attempted to keep herself removed from the conduct. She had Breault and Pellitteri hold vaccine clinics on days she was not in the office, she sent Pellitteri her patients, and she maintained plausible deniability. She now seeks to leverage that manufactured plausible deniability in her sentencing submission by arguing that she was minimally involved. But the facts demonstrate otherwise. She was actively involved in planning the scheme, she directed patients to Pellitteri, and she directed Breault and Pellitteri as to how to carry out the scheme.

Finally, McDermott took steps to limit the fallout of her fraud once she knew she was being investigated. Text messages demonstrate that she reached out to Pellitteri and asked her to chat "discreetly" after they learned that the FBI contacted victims. After Pellitteri left McDermott's employ, McDermott mailed Pellitteri her last paycheck with a typed document listing her Fifth Amendment rights, knowing that Pellitteri was someone who could severely implicate her in the instant scheme. (See Exhibit J, attached hereto.)

[9] See Exhibit I, attached hereto. Breault and Pellitteri also confirmed to law enforcement that Sage-Femme created false flu vaccination records.

2. <u>The Nature and Circumstances of the Offense and the Need to Promote Respect for the Law Requires a Substantial Sentence</u>

McDermott's offense was gravely serious. She and her co-conspirators distributed a tremendous number of fake COVID-19 vaccination cards. They painstakingly entered each of approximately 2,600 individuals' information into the New York State database so that they would have rock-solid proof of "vaccination." Providing fake proof of vaccination was insufficient to achieve their goals—they also destroyed vaccines that were scarce and in demand.

Significant punishment is necessary to promote respect for the law. Individuals like McDermott put themselves above the law and supplant their own judgment for that of legislators and public health officials. A lenient sentence would send a clear message that those who act in disagreement with the laws under the guise of medical decision making can act with impunity.

The Guidelines in this case fail to provide just punishment for the conduct. They are principally driven by the loss to the government, which is approximately $37,000 based on the value of the destroyed vaccines. But the effects of McDermott's conduct on the public health system and public health are not readily quantifiable, which is precisely why the Guidelines include a policy statement about matters significantly impacting public health. Many of McDermott's patients were health care workers who, by lying about being vaccinated, undoubtedly further contributed to the pandemic. Each of McDermott's unvaccinated patients encountered countless others who were lied to and wrongly assumed they were dealing with a vaccinated person. And at least 2,600 people went unvaccinated for some period because of the vaccine doses destroyed at Sage-Femme. A significant sentence is more than justified in this case.

3. <u>A Significant Sentence Affords Specific and General Deterrence</u>

Contrary to her claim otherwise, McDermott is a prime candidate for specific deterrence. While she bills herself as promoting patient "choice," she has shown that this promotion is through widespread fraud against the health care system in which she is entrusted to operate. Prior to distributing false COVID-19 vaccination records, she and others at Sage-Femme provided false influenza vaccination records. During the COVID-19 pandemic, she was not above falsifying records to justify patient "choice." For example, in an undated conversation with patient T.N. where T.N. indicated she was looking for proof of vaccination without being vaccinated, McDermott texted T.N., "You are allergic to polysorbate 80… I can retro document…no Pfizer or moderna…That means only j and j." T.N. replied, "I did . . . testing a year ago I should see what it says," and McDermott told T.N., "I said YOU ARE ALLERGIC to polysorbate 80 Health history is subjective . . . I don't challenge a self report . . . I just document it," suggesting she would falsify T.N.'s medical records to justify T.N.'s vaccine resistance. (<u>See</u> Exhibit K, attached hereto.) This stands in stark contrast to McDermott's assertions that she is a passive participant just doing as her patients wish. At bottom, McDermott is an ideologue, and she has time and again put her beliefs above those of the public health authorities and the rules imposed. Her views

prove that specific deterrence is a concern, and a significant sentence is necessary to prevent the recurrence of similar conduct.

As the Second Circuit has noted, significant sentences are also particularly appropriate in white collar crimes to promote general deterrence. See, e.g., United States v. Goffer, 721 F.3d 113, 132 (2d Cir. 2013) (noting that some feel that white collar crimes are a "game worth playing"). "'Persons who commit white-collar crimes like [d]efendant's are capable of calculating the costs and benefits of their illegal activities relative to the severity of punishments that may be imposed. A serious sentence is required to discourage such crimes.'" United States v. Vrancea, 136 F. Supp. 3d 378, 392 (E.D.N.Y. 2015) (quoting United States v. Stein, No. 09-CR-377, 2010 WL 678122, at *3 (E.D.N.Y. Feb. 25, 2010) (Weinstein, J.)). Too often, white-collar defendants point to their family obligations and their ability to satisfy monetary penalties as a basis for courts to give them a pass for white collar crimes.

McDermott does just that here, repeatedly pointing out that she has already paid restitution and claiming there is therefore no "loss" and no one was harmed. (Defense Submission at 9, 12.) She has calculated the cost of the offense as repaying the money the government lost because of her fraud and suggested that by already repaying that amount justice is served. Additional punishment is necessary to deter her and similar defendants from committing fraud when they have calculated the monetary risk and can afford to pay for their crimes. Further, accepting these and similar arguments only confirms the Second Circuit's concerns that letting white collar crimes go largely unpunished only leads to more fraud. For these reasons, the Court should impose a significant sentence to show that white collar crimes are serious crimes that defendants cannot simply pay their way out of.

4. A Significant Sentence Avoids Unwarranted Sentencing Disparities

A substantial sentence is also necessary to avoid unwarranted sentencing disparities, which is required under Section 3553(a)(6). Numerous cases in this District and beyond have recognized that incarceration is appropriate for those who take public health into their own hands and distribute fake vaccine cards.

A similar scheme in this District, albeit involving less egregious facts, resulted in significant sentences for two defendants. In United States v. Liu, No. 22-CR-70 (DG), two men, one of whom was a registered nurse, stole, forged, and distributed approximately 300 COVID-19 vaccine cards to individuals who were unvaccinated. Some of those recipients paid to have their information placed into the New York State database. Judge Gujarati sentenced the nurse defendant to 30 months in prison and the co-defendant to 21 months in prison.

McDermott's case is more egregious than Liu in many respects. First, while Liu involved a registered nurse, McDermott is a midwife who should be held to a higher standard. Second, Liu involved approximately 300 cards, and McDermott distributed more than eight times as many. Finally, while Liu involved stolen vaccine cards, McDermott legitimately obtained the cards Sage-Femme distributed and she and her co-defendants

falsely entered every single false vaccine record into the New York State database, corrupting the health care system under the guise of legitimate care. Legitimate cards and database entries had more value because they could be vetted by those who they were provided to, and McDermott and her patients recognized this. A sentence of 36 months' imprisonment avoids unwarranted disparities with the Liu case and provides appropriate punishment for McDermott's crime.

In the District of Utah, a defendant who sold over 120,000 fake COVID-19 vaccination cards was sentenced to 12 months' imprisonment and ordered to pay a $40,000 fine. See ECF No. 122, United States v. Sciotto, No. 23-CR-23 (D. Utah Oct. 11, 2024). The Sciotto case again presents less egregious facts than McDermott's case. Sciotto was not a health care provider, and he did not have access to legitimate COVID-19 vaccine cards. Sciotto, however, establishes that incarceration is appropriate to punish this type of crime.

In the Northern District of California, a defendant who sold at least 200 fake COVID-19 vaccination cards was sentenced to 33 months' imprisonment. See ECF No. 58, United States v. Mazi, No. 22-CR-36 (N.D. Cal. Nov. 29, 2022). The Mazi case is like McDermott's case in many respects. Mazi was a Naturopathic Doctor, a type of advanced practice medical provider, who provided legitimate COVID-19 vaccine cards to individuals, albeit with fake vaccine information because no vaccines were ever administered. In sentencing Mazi to 33 months, the court recognized the seriousness of a medical provider taking the law into her own hands. This Court should do the same.

Finally, in Manhattan, a woman was sentenced to at least 18 months' imprisonment for selling approximately 250 fake COVID-19 vaccination records.[10] That woman does not appear to have been a health care provider, and she sold a fraction of the fake vaccine cards McDermott distributed.

Each of these cases demonstrates that monetary punishment alone is insufficient to deter individuals from committing this sort of crime and to protect the public from vigilante health care providers.

IV. Restitution and Fine

Under 18 U.S.C. § 3663A, the Court shall impose restitution. In United States v. Zangari, 677 F.3d 86, 93 (2d Cir. 2012), the Second Circuit held that restitution must be measured according to the victim's actual loss, not the defendant's gain. Moreover, in calculating restitution, "these losses need not be mathematically precise," and "[a] reasonable approximation will suffice, especially in cases in which an exact dollar amount is inherently incalculable." United States v. Rivernider, 828 F.3d 91, 115 (2d Cir. 2016) (internal quotation marks omitted).

---

[10] https://www.law360.com/articles/1862362.

The government respectfully submits that the Court should order McDermott to pay restitution in the amount of $37,414.40 to the United States Treasury, which represents the CDC's estimate of the cost of the vaccines Sage-Femme destroyed. (See PSR ¶ 116.)

Additionally, the PSR notes that McDermott appears able to pay a fine. (Id. at ¶ 104.) The government respectfully submits that a fine is appropriate in this case, particularly because the government is not seeking to disgorge any monetary gain derived from the scheme, and the evidence demonstrates there was some monetary gain.

V. Conclusion

For the reasons discussed above, the government respectfully requests that the Court sentence McDermott to 36 months' imprisonment, order restitution in the amount of $37,414.40, and order an appropriate fine.

Respectfully submitted,

BREON PEACE
United States Attorney
Eastern District of New York

GLENN S. LEON
Chief, Fraud Section
Criminal Division
U.S. Department of Justice

By: /s/*Patrick J. Campbell*
Patrick J. Campbell
Trial Attorney, Fraud Section
Criminal Division
U.S. Department of Justice
(202) 262-7067

cc: Clerk of Court (RPK) (by email)
Benjamin Hill, Esq. (by email)
Probation Officer Frank Nikolaidis (by email)